**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

|                          |   |                                      |
|--------------------------|---|--------------------------------------|
| IRENE O'CONNELL,         | x | Hon. Stanley R. Chesler, U.S.D.J.    |
|                          | x |                                      |
|        plaintiff,        | x |                                      |
|                          | x | Civil Action No. 04-3499             |
| v.                       | x |                                      |
|                          | x | **OPINION**                          |
| UNUM PROVIDENT, et al.,  | x |                                      |
|                          | x |                                      |
|        defendants.       | x |                                      |

_____

**CHESLER, District Judge**

## I.      INTRODUCTION

This matter comes before the Court by way of motion of the Defendants Unum Provident Corporation ("Unum Provident") and Unum Life Insurance Company of America (collectively "Unum") for summary judgment on plaintiff Irene O'Connell's claim that Unum improperly denied her disability benefits under an employee benefits plan governed by the Employee's Retirement Income Security Act ("ERISA"). For the following reasons, Unum's motion is granted as to plaintiff's claims for benefits for disabilities related to her surgeries and denied as to her claims for benefits for disability related to anxiety and depression.

## II.     FACTS

Plaintiff brings this action to challenge the determination of a health insurance provider that denied her disability benefits. Because the Court must determine if defendants' determination was appropriate given the information before them, Mitchell v. Eastman Kodak

1

<u>Co.</u>,  113 F.3d 433, 440 (3d Cir. 1997)[1], the Court will consider only the record before the claims administrator at the time of the determinations.

### A.    The Relevant Policies

While employed at Financial Resources Federal Credit Union ("Financial Resources"), plaintiff participated in an ERISA-covered plan (the "Plan"), which provided long term disability benefits.  Under the Plan, plaintiff was covered by two insurance policies:  the Group Policy and the Supplemental Policy.  Unum Provident issued the Group Policy, (Affidavit of Thomas Deibold ("Deibold Aff. ¶__") at ¶9), and Provident Life and Accident Insurance Company issued the supplemental income protection plan (the "Supplemental Policy").  (Deibold Aff. ¶10.)[2] Plaintiff has applied for benefits under both the Group Policy and the Supplemental Policy and Unum administered her applications with respect to both.[3]  (Deibold Aff. ¶2.)  Thus, a review of

--------

[1]While the record for review of ERISA benefits denial is that made before the plan administrator and cannot be supplemented during litigation, <u>see</u> <u>Mitchell</u>, 113 F.3d at 440, courts may consider evidence of potential biases and conflicts of interest that is not found in the administrator's record when deciding what standard of review.  <u>Kosiba v. Merck & Co.</u>, 384 F.3d 58, 67 n.5 (3d Cir. 2004).

[2]The defendants argue that plaintiff incorrectly sued "Unum Provident."  Defendants maintain that the proper parties are Unum Life Insurance Company of America ("Unum Life"), which funded the Group Policy and administered claims, and Provident Life and Accident Insurance Company, which funded the Supplemental Policy, both of which are movants.  (<u>See</u> Unum's Brief at 1 & n.1.)  Defendants explain that Unum Provident is a holding company that owns Unum and, indirectly, Provident Life and Accident Insurance Company.  (Deibold Aff. ¶1.) Given that Unum Life and Provident Life are movants, the Court will treat the pleadings as amended for the purpose of this motion.  <u>See</u>, <u>e.g.</u>, <u>U.S. v. 2001 Honda Accord EX VIN #1HGCG22561A035829</u>, 245 F. Supp. 2d 602, 613-14 (M.D. Pa. 2003).

[3]The relevant provision of the Group Policy states as follows:

DISCRETIONARY ACTS
In exercising its discretionary powers under the Plan, the Plan
Administrator, and any designee (which shall include Unum as a

2

the relevant provisions from those policies is necessary.

i. **The Group Policy**

Participants are eligible for disability benefits if certain requirements under the Group

Policy are met.[4]  This motion implicates two particular requirements, namely whether or not

> claims fiduciary) will have the broadest discretion permissible
> under ERISA and any other applicable laws, and its decisions will
> constitute final review of your claim by the Plan.  Benefits under
> this Plan will be paid only if the Plan Administrator or its designee
> (including Unum), decides in its discretion that the applicant is
> entitled to them.

(UACL 00457.)  The Supplemental Policy does not appear to contain such a provision.

[4]These requirements are embodied in large part, in a provision of the Group Policy that

provides as follows:

> **WHAT INFORMATION IS NEEDED AS PROOF OF YOUR
> CLAIM?**
> Your proof of claim, provided at your expense, must show:
> –        that you are under the **regular care** of a **physician**;
> –        the appropriate documentation of your monthly earnings;
> –        the date your disability began;
> –        the cause of your disability;
> –        the extent of your disability; including restrictions and
>          limitations preventing you from performing your regular
>          occupation; and
> –        the name and address of any **hospital or institution** where
>          you received treatment, including all attending physicians.
>
> We may request that you send proof of continuing disability
> indicating that you are under the regular care of a physician.  This
> proof, provided at your expense, must be received within 45 days
> of a request by us.
>
> In some cases, you will be required to give Unum authorization to
> obtain additional medical information and to provide non-medical
> information as part of your proof of claim, or proof of continuing

plaintiff adequately demonstrated that she is disabled and that she received continuous

appropriate medical care.

Participants are eligible for benefits if they remain continuously disabled throughout a

180-day "Elimination Period."[5]  (UACL 00486, 00475.)[6]  The Group Policy defines "Disability"

as follows:

> You are disabled when Unum determines that:
>
> –   you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
> –   you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

(UACL 00475.)  This definition incorporates the following defined terms:

> **LIMITED** means what you cannot or are unable to do.
>
> **MATERIAL AND SUBSTANTIAL DUTIES** means duties that:
> –   are normally required for the performance of your regular occupation; and
> –   cannot be reasonably omitted or modified.

---

> disability.  Unum will deny your claim, or stop sending you payments, if the appropriate information is not submitted.

(UACL 00484.)

[5]According to the Group Policy, "Elimination Period" simply means a period of continuous disability which must be satisfied before a participant is eligible to receive benefits. (UACL 00456.)

[6]References to "UACL ___" refer to the record before Unum at the time it administered plaintiff's claim.  The record is attached to the Deibold Aff. as Exhibit A.

> **REGULAR OCCUPATION** means the occupation you are
> routinely performing when your disability begins.  Unum will look
> at your occupation as it is normally performed in the national
> economy instead of how the work tasks are performed for a
> specific employer or at a specific location.
>
> **SICKNESS** means an illness or disease.  Disability must begin
> while you are covered under the plan.
>
> **INJURY** means a bodily injury that is the direct result of an
> accident and not related to any other cause.  Disability must begin
> while you are covered under the plan.
>
> **MONTHLY EARNINGS** means your gross monthly income from
> your Employer as defined in the plan.

(UACL 00475.)

A participant must further support his or her application with proof of "regular care of a

physician."  (UACL 00484.)  "Regular care" is a defined term in the policy that means:

> –    you personally visit a physician as frequently as is
>      medically required, according to generally accepted medical
>      standards, to effectively manage and treat your disabling
>      condition(s); and
> –    you are receiving the most appropriate treatment and care
>      which conforms with generally accepted medical standards,
>      for your disabling condition(s) by a physician whose
>      specialty or experience is the most appropriate for your
>      disabling condition(s), according to generally accepted
>      medical standards.

If a participant successfully demonstrates disability and regular care by a physician, he or

she is entitled to received sixty percent of monthly earnings, not to exceed $6,000 per month,

subject to deduction for the receipt of certain other benefits, if any.  (UACL 00474-75.)  Social

Security benefits are among the deductible sources of income.  (UACL 00472-73.)   Coverage

under the Group Policy ends the last day of active employment except as provided under the

covered layoff or leave of absence provision.  (UACL 00469-00470, 00477.)  With respect to

disability due to mental illness, the Group Policy contains a 24 month limit on the payment of

benefits.  (UACL 00469.)  The Group Policy defines "mental illness" as follows:

> MENTAL ILLNESS means a psychiatric or sociological condition
> regardless of cause such as schizophrenia, depression, manic
> depressive or bipolar illness, anxiety, personality disorders and/or
> adjustment disorders or other conditions.  These conditions are
> usually treated by a mental health provider or other qualified
> provider using psychotherapy, psychotropic drugs, or other similar
> methods of treatment.

(UACL 00455.)

## ii.    The Supplemental Policy

The Supplemental Policy provides for the payment of monthly benefits to a participant

that is totally disabled.  (UACL 00036.)  Under the Supplemental Policy, "total disability" is

defined as follows:

> Total Disability, or totally disabled, during the first two years of a
> period of disability, means that, due solely to Injuries or Sickness:
>     1.    You are not able to perform the substantial and
>           material duties of your occupation; and
>     2.    You are not working in any other gainful
>           occupation.
> Thereafter, Total Disability, or totally disabled, means that, due
> solely to Injuries or Sickness, you are not able to perform the duties
> of any gainful occupation for which you are suited based on your
> education, training, and experience.
>
> You must be receiving the care of a Physician which is appropriate
> for the condition causing your disability.  We will waive this
> requirement when we are furnished proof, satisfactory to us, that
> continued care would no longer be of benefit to you.

(UACL 0036.)  The Supplemental Policy also contains a 180-day Elimination Period before

benefits become payable.  (UACL 00037.)

The Supplemental Policy further limits benefit payments for mental disorders to 24 months.  (UACL 00049.)  It provides as follows:

**Limitation for Mental Disorders**

> Benefits for any loss caused by Mental Disorders will be limited in aggregate to a maximum of 24 monthly payments during the life of this policy.  However, we will pay benefits, subject to the Maximum Benefit Period shown on Page 3, for loss caused by Mental Disorders for as long as you are thereby continuously confined in a Hospital under the care of a Physician.

> Mental Disorders means any disorder (except dementia resulting from stroke, trauma, infections or degenerative diseases such as Alzheimer's disease) classified in the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association, most current as of the start of the period of disability.  Such disorders, include, but are not limited to, psychotic, emotional, or behavioral disorders, or disorders relatable to stress or to substance abuse or dependency.  If the DSM is discontinued or replaced, these disorders will be those classified in the diagnostic manual then in use by the American Psychiatric Association as of the start of the period of disability.

(UACL 00033.)

**B.     Plaintiff's Medical History**

Plaintiff's relevant medical history began on May 3, 2001, when Dr. Bilal Mian performed a neurological examination on her.  (UACL 00380-00381.)  Dr. Mian noted plaintiff's complaints of numbness of the left cheek and face, mild light headedness, impaired balance and "feeling very tired and exhausted easily."  (UACL 00381.)  On May 4, 2001, plaintiff underwent an ultrasound carotid doppler procedure, which revealed an 80 to 99 percent stenosis of the left internal carotid artery and a 50 to 79 percent stenosis of the right internal carotid artery.[7]  (UACL

_____

[7]The carotid artery is the principal artery of the neck.  Dorland's Illus. Med. Dictionary at 300 (30th ed. 2003).

00299.)  On June 5, 2001, she underwent a left carotid endarterectomy.[8]  (UACL 00243-00245.)

Plaintiff took medical leave from Financial Resources from May 21, 2001 through July 30, 2001

for this surgery.  (UACL 00375.)

On July 3, 2001, plaintiff was evaluated by Dr. Richard Hodosh, a neurosurgeon.  Dr.

Hodosh reviewed radiology films and saw an approximately three or four millimeter aneurysm[9]

of the basilar tip.  He noted plaintiff's history of significant fatigue, which had been present for

the last year and a half.  (UACL 00288-00290.)

On August 9, 2001, plaintiff underwent a left heart catheterization.  Dr. Sternberg, the

cardiologist who performed the procedure, reported that plaintiff tolerated the procedure well and

that her left ventricular function was normal.  (UACL 00306.)

On October 30, 2001, plaintiff underwent a craniotomy and clipping of a basilar

aneurysm, performed by Dr. Hodish.  (UACL 00238-00239.)  Plaintiff took medical leave from

her employer from October 29, 2001 for this surgery.  She returned to work part-time in January

2002, and full-time on February 1, 2002.  (UACL 00375.)

On November 29, 2001, Dr. Hodosh examined plaintiff for a post-operative follow-up.

He noted that plaintiff

> is sleeping well and eating OK but feels as though her
> concentrating abilities may be diminished somewhat and notes that
> she fatigues.  The patient does report to me that fatigue had been a
> problem to her preoperatively and she has undergone evaluation
> under your direction prior to this.  However, since surgery she feels

---

[8]An carotid endarterectomy is the excision of a portion of an artery performed for the prevention of stroke.  Dorland's at 612.

[9]An aneurysm is a sac formed by the dilation of the wall of an artery, a vein, or the heart; it is filled with fluid or clotted blood, often forming a pulsating tumor.  Dorland's at 81.

> as though the level of fatigue has increased.  Her husband does
> note that on a daily basis he sees signs of slow but steady
> improvement in these areas.

(UACL 00279.)  Dr. Hodosh reported that plaintiff was no longer on any medications and he

observed that plaintiff was bright, alert and her outlook was "excellent."  (UACL 00278-00279.)

On January 10, 2002, Dr. Ferraro, plaintiff's primary care physician, examined the

plaintiff and diagnosed her with fatigue and abnormal sleep.  He recommended a treatment plan

that included a sleep study.  (UACL 00433.)

On January 15, 2002, Dr. Hodosh examined plaintiff on a follow-up visit.  He stated as

follows:

> Mrs. O'Connell returned to the office today feeling as though she
> has pretty much returned back to her baseline.  She continues to be
> bothered by a sense of fatigue that existed prior to her surgery.
> However, she is not experiencing any headaches, no double vision
> and has resumed driving . . . .
>
> She remains bright and alert without any evidence of double vision
> or extraocular movement dysfunction.  Her balance is excellent and
> she is without focal or lateralizing neural change.
>
> From a neurosurgical point of view, I am willing to discharge her
> from regular follow-up but I wold like to see her in one year to see
> how she is functioning at that time.

(UACL 00276.)  This report makes no mention of plaintiff's prior complaint regarding

concentration.

From January 15, 2002 through January 30, 2003, plaintiff's only medical treatment

appears to have been for cold symptoms.  Specifically, Dr. Ferraro examined her on January 21,

2002, noting a "cough, cold x6 days."  (UACL 00434.)  Plaintiff visited Dr. Ferraro again on

October 15, 2002, during which he noted "congestion" and "aches all over for two days."

(UACL 00435.)

On January 30, 2003, plaintiff had a follow-up visit with Dr. Hodosh, who reported as follows:

> She has returned to work.  Initially she had some difficulty with writing with her right hand and that is cleared.  She has noted that she is able to go to work, get through the day and have no trouble with cognitive functions, but at the end of the day early in the evening she feels fatigued and needs to go to bed.
>
> . . . .
>
> The patient is bright, alert, oriented without focal lateralizing neurological deficits.  Her craniotomy site is well healed.

(UACL 00275.)  Dr. Hodosh recommended follow-up with plaintiff's primary physician if fatigue persisted.  (UACL 00275.)

In February of 2003, plaintiff had an encounter with her supervisor at work related to checks that she signed, which were disbursed.  (Affidavit of Charles C. Schalk, Esq. ("Schalk Aff."), Ex. A; UACL 00271.)[10]  The president of plaintiff's employer advised her that she should not have signed the checks.  (Id.)  He further also told her she was "not the same girl" after her surgery.  (Id.)

On March 14, 2003, Dr. Ferraro examined plaintiff.  His notes state "anxiety 2nd job." His notes also reflect diagnoses of hypertension, "S/P [status post] brain aneurysm," and "S/P [status post] carotid endarterectomy" and "S/P [status post] carotid stenosis."  (UACL 00234.)

On March 31, 2003, plaintiff was again examined by Dr. Ferraro.  He noted that plaintiff was "presenting to this office for follow-up because of difficulties at work, especially with

_____

[10]Information related to plaintiff's work encounter was communicated to Unum in plaintiff's counsel's November 18, 2003 letter.  (UACL 00271.)

10

retention.  She had increased work load and stress," and was having difficulty performing job functions, "probably secondary to surgeries as noted in her past medical history."  (UACL 00437.)  Dr. Feraro performed a mini-mental exam on the plaintiff and she scored 26 out of a possible 30.  (UACL 00423.)  Plaintiff scored a 1 out of a possible 5 in "Attention and Calculation" and a 1 out of a possible 3 in "Recall."  (UACL 00423.)  Although Dr. Ferraro does not address how plaintiff had been able to perform at work during the 15 months following her surgery, he did conclude that, as of March 31, 2003, plaintiff "is disabled from present work" and "will commence disability on 4/14/03 and be on permanent/long term disability," and recommended that she see a neurologist.  (UACL 00241.)  Dr. Ferraro also noted that plaintiff was taking Aricept, a drug used a drug used to treat mild to moderate dementia related to Alzheimer's disease that may improve memory, awareness, and the ability to function.[11]  (UACL 00241.)

### C.     Plaintiff's Application for Benefits

On July 8, 2003, plaintiff submitted a claim to Unum for disability benefits.  (UACL 00007.)  In support of her claim, she submitted a Physician's Statement from Dr. Ferraro, which diagnosed her with "Stress, HTN [hypertension], S/P [status post] brain aneurysm and S/P carotid endarterectomy."  (UACL 00005.)  His statement further listed plaintiff's restrictions as "Avoid Stress – Complex Decision Making," and provided no limitations.  Dr. Ferraro stated that March 31, 2003 was the date of plaintiff's first office visit for this illness or injury, the restrictions began "3/03," and that plaintiff was first unable to work on March 31, 2003.  (UACL 00005.)  Plaintiff also submitted an employer's statement that she was employed as a coordinator

---

[11]The Physician's Desk Reference1086 (60th ed. 2006).

of member administration at Financial Resources Federal Credit Union and that her last day of work was April 14, 2003.  (UACL 00003.)

On July 28, 2003, Jessica Starr, a Customer Care Specialist at Unum called plaintiff and was told that all correspondence should be with plaintiff's husband.  Plaintiff's husband told Ms. Starr that plaintiff became upset and left work after her employer suspected that she made a mistake on some paperwork.  (UACL 00134-00135.)  The call notes further reflect a discussion of about plaintiff's employer's observations that "for a period of one year that her work was starting to be in question, she was not on top of things as she was in the past."  (UACL 00135.)

On August 20, 2003, Unum received plaintiff's job description (Deibold Aff. at ¶ 54-55) and categorized her as a customer care specialist, which requires lifting, carrying, pushing, pulling up to 20 pounds occasionally, and or ten pounds.  (Id.; UACL 00376.)  According to Unum's definition, her job requires constant talking and hearing, frequent reaching, handling, fingering, accommodation and near acuity.  (UACL 00376.)  It would require dealing with people, and attaining precise set limits, tolerances and standards.  (UACL 00376.)

Ms. Starr called plaintiff's residence again on August 25, 2003.  Ms. Starr advised plaintiff's husband that Unum had not yet received information from Dr. Hodosh and that he stated she had seen Dr. Hodosh only weeks before.  (UACL 00085.)  Plaintiff's husband told her that plaintiff had seen Mr. Mian, a neurologist, in March or April, but had not been back to him. (UACL 00085.)  He also stated that Dr. Ferraro advised her to see a neurosurgeon and concluded she is "slowing down a bit."  (UACL 00085.)

Having received no further records from Dr. Hodosh, Unum undertook a review of the medical records it had before it at the time to determine whether or not plaintiff's claimed

disability was covered.  On September 10, 2003, Rachel Fortin-Sanville, R.N., a nurse employed

by Unum, reviewed all medical data on file and concluded she did not have enough data to

determine functional capacity at that time.  (UACL 00121.)  On September 17, 2003, Dr. George

DiDonna, M.D., FACC, vice president and medical director of Unum, reviewed plaintiff's

medical records and concluded as follows:

> Based on a reasonable degree of medical probability and the
> medical records on file as of this date, there does not appear to be a
> medical foundation for the complaints of inability to perform her
> sedentary capacity occupation.  There is no evidence of any organic
> brain syndrome, loss of mental capacity or inability to make
> complex decisions based on the medical records in the file at this
> time.  The mini-mental status score of 26/30 is not in and of itself
> reliable enough to make a diagnosis of a cognitive impairment in
> the absence of corroborative information.  The fact that the
> claimant has had a carotid endarterectomy and a basilar artery
> aneurysm clipping with an uncomplicated course should not, based
> on a reasonable degree of medical certainty lead to memory or
> cognitive deficits.  In fact the neurosurgeon indicated that
> postoperatively she was back to her baseline state.

(UACL 00117.)

By correspondence dated September 25, 2003 and October 13, 2003, Unum advised

plaintiff that her claim was submitted for medical review and was denied.  The October 13 letter

recapped the above chronology of Unum's review process and the medical records supporting

plaintiff's claim.  (UACL 00011-00015.)  The letter concluded as follows:

> Based on the above review of your occupation, and of the medical
> information in the file, there is no indication of what changed from
> the time you returned to work status/post cerebral aneurysm in
> February of 2002, and the date you were last unable to work in
> March of 2003.  Additionally, the information that has been made
> available does not support the restrictions and/or limitations as
> given by Dr. Ferraro.  Therefore, you did not meet the above
> mentioned definition of disability throughout the entire elimination

13

> period that would have extended from 4/15/2003 through
> 10/11/2003 and we must deny any and all liability on your claim.

(UACL 00012.)  The letter further advised plaintiff of her right to appeal the decision.

### D.    Plaintiff's Appellate Reviews of the Claim Determination

On November 18, 2003, plaintiff's counsel appealed Unum's denial.  In support of her

appeal, plaintiff submitted additional medical records dated March 31, 2003 (UACL 00256),

June 3, 2003 (UACL 00255 assessing plaintiff with "memory loss"), July 3, 2003 (UACL 00254

assessing plaintiff with "memory loss" and noting "con't perm. disability"), August 21, 2003

(UACL 00253 assessing plaintiff with "memory loss") and October 2, 2003 (UACL 00252),

showing treatments by Dr. Ferraro.  The July 3, 2003 and August 21, 2003 records reference

plaintiff being prescribed Aricept.  Reference is made in Unum's July 28, 2003 notes by Jessica

Starr that plaintiff was taking "Arscent 10 mg 1x per day."  (UACL 00133.)

Upon receipt of the additional information, Unum reviewed her medical file in view of

the following questions:

> 1)    Do the medical records indicate a deteriorating condition
>       that would result in restrictions or limitations as of 3/14/03?
>       . . . .
>
> 2)    Does the medical evidence reasonably support the claimant
>       and her AP's [attending physician's] contention that she
>       should avoid stressful situations and complex decision
>       making?
>
> 3)    Has the claimant received regular and appropriate care
>       consistent with an impairing condition resulting from
>       inability to tolerate stress or complete complex decision
>       making?

(Deibold Aff. at ¶66; UACL 00226-00227.)

14

On or about January 12, 2004, Alan Neuren, M.D., a neurologist employed by Unum, issued a coverage opinion based on a review of plaintiff's medical records. Dr. Neuren concluded that "it was not credible or consistent that the insured would have sustained cognitive impairment as a consequence of the carotid artery stenosis or the aneurysm or the treatments for the conditions." (UACL 00105.) He further noted the absence of a neurological evaluation, despite reported anxiety about plaintiff's job. Moreover, he noted the absence of any records to indicated plaintiff was appropriately evaluated for cognitive impairment. He concluded that Dr. Ferraro's mini-mental status exam was inadequate. He stated that it showed deficits in "calculations and recall" but that "recall can be affected by non-physical variable such as anxiety or depression" and "[c]onsequently, these results are not adequate for a determination of cognitive impairment." (UACL 00105-00106.) Dr. Neuren noted that plaintiff had been treating with Aricept, but dismissed this by stating there "is no reference to her taking this agent on the most recent visits of 1/02/03." (UACL 00222.)

Meanwhile, on January 6 and 27, 2004, Dr. Michelle Papka, Ph.D., neuropsychologist and psychotherapist, examined plaintiff and generated a report (the "Papka Report"). The Papka Report referenced the incident between plaintiff and her supervisor at Financial Resources. The report stated:

> Despite the facts that she had received favorable reviews by her supervisors for 1 year, Mrs. O'Connell was later harshly criticized by her boss, who blatantly told her that she was "not the same person that she was before the surgery" and was not doing a good job. For 14 years, Mrs. O'Connell was a stellar employee for the credit union, winning the praise of her colleagues and receiving various awards and certifications. Therefore, this negative interaction with her boss was a very traumatic experience, and she quickly left her place of employment, not wanting to return. Since

that episode with her boss, she has had an increased level of
anxiety and markedly reduced self confidence.

(UACL 00207.)  Dr. Papka noted instances of panic attacks since the episode at work and "[t]his

increased level of anxiety began after the negative episode with her boss, and is gradually getting

worse." (UACL 00207.)

After performing several tests, Dr. Papka concluded that plaintiff was severely impaired

with respect to psychomotor speed using the dominant hand, written arithmetic, and simple

tracking; moderately impaired with respect to verbal recognition and timed three-dimensional

visuospatial construction; and mildly impaired with respect to rote attention, working memory,

figural memory, written language, confrontational naming, visuospatial construction, mental

flexibility and speed, and verbal fluency to letters.  (UACL 00204.)  Dr. Papka stated that

plaintiff's symptoms suggest a generalized anxiety disorder and major depressive syndrome.

(UACL 00204.)

With respect to plaintiff's surgeries, Dr. Papka stated as follows:

> Evidence for cognitive sequelae following neurosurgical removal
> of a basilar tip aneurism is lacking in the literature.  Based on the
> history and information provided by this evaluation, the most likely
> explanation for Mrs. O'Connell's cognitive impairment is anxiety
> and depression.  It is important to recognize that psychological
> distress can result in real, measurable changes in cognition and
> needs to be treated seriously.  Furthermore, failed attempts to
> resume previous activities may result in additional psychological
> distress, further exacerbating cognitive impairment.

(UACL 00204.)  Thus, Dr. Papka concluded that the surgeries likely did not cause the

impairments that she observed in the plaintiff.  She further recommended psychotherapy, and

potential pharmacological treatment of the plaintiff's emotional disorders.  (UACL 00203.)

16

On February 23, 2004, Unum received a fax copy of the Papka Report.  (Schalk Aff., Ex. G; UACL 00220.)  Upon receipt, Dr. Neuren reviewed it and concluded the report was deficient because it did not include "validity testing or personality assessments."  He noted that Dr. Papka cited lack of supportive literature for cognitive dysfunction from basilar tip aneurysm surgery and concluded that "there is no evidence of physically based dysfunction that would rise to a level of impairment."  (UACL 00103-00104.)

Plaintiff's counsel wrote to Unum on March 10, 2004, advising that Dr. Ferraro, after consulting with Dr. Papka, started plaintiff on Wellbutrin, a drug used to treat depression, "beginning this week."  (UACL 00194.)  He further advised that sleep studies would be completed on March 16, 2004.  (UACL 00194.)

On April 16, 2004, Jana Zimmerman, Ph.D., a licensed clinical neuropsychologist consultant with Unum, reviewed the entire medical file up to that point and concluded (1) there was no evidence of treatment for a psychiatric condition as of March 14, 2003; (2) Dr. Ferraro's restriction to avoid stressful situations was unsubstantiated or supported by outdated tests; (3) plaintiff did not receive regular and appropriate care consistent with a psychiatric disorder; and (4) there was a five-week delay between Dr. Papka's recommendations for therapy and plaintiff's treatment with Wellbutrin, which is inconsistent with serious psychological impairment.  (UACL 00181-00182.)

On April 26, 2004, Unum advised plaintiff, through her counsel, that it had completed appellate review of the denials of her claims for disability benefits under the Group and Supplemental policies.  The letter concluded that "impairment based on a neurological condition was not supported or consistent with the medical documentation"; Dr. Ferraro's restrictions to

17

avoid stress and complex decision making were unsubstantiated; raw test data from Dr. Papka's examination was incomplete and the evaluation was apparently truncated.  The letter went on to challenge the sufficiency of the tests performed and the interpretation of their results.  Unum further concluded that the five-week gap between Dr. Papka's recommended treatment and the commencement of plaintiff's treatment with Wellbutrin belied the existence of a serious psychiatric disorder.  Further, Unum noted that plaintiff was not treated for a psychiatric condition as of March 14, 2003 and notes that the policies do not consider an incapacity with respect to "job specific stressors related to her particular employer or worksite," but rather plaintiff's ability to perform the "material and substantial duties of her occupation as it exists in the national economy."  Unum concluded that plaintiff's "stresses" likely derive from her relationship with her manager and their review did not support an adequate level of incapacity to perform the material and substantial duties of her job as it exists in the national economy. (Affidavit of Charles Z. Schalk, Esq., Ex. O.)

On May 18, 2004, plaintiff submitted to Unum a copy of her notice of award from the Social Security Administration ("SSA"), which found her disabled, and requested reassessment of her claim.  (UACL 00160-00162.)  Unum responded by way of letter dated May 21, 2004, that the SSA standards for disability differ from those under the Group and Supplemental policies and reaffirmed its denial.  (UACL 00138-00139.)

### E.    The Instant Action

Plaintiff filed this action on June 7, 2004 in the Superior Court of New Jersey, Law Division, Somerset County and, on July 22, 2004, the defendants' removed the case to federal court.  [Docket Entry No. 1.]  Plaintiff alleges that defendants wrongfully denied her disability

benefits under the Group Policy and the Supplemental Policy.  On April 22, 2005, the defendants

filed the instant motion for summary judgment.  [Docket Entry No. 10.]

## III.   DISCUSSION

### A.   Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing

the facts in the light most favorable to the non-moving party, the moving party is entitled to

judgment as a matter of law."  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d

Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); Fed. R. Civ. P. 56(c).

Thus, a court will enter summary judgment only when the record shows "there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c).  Thus, the Court must decide if there is any issue of material fact at to

whether or not Unum appropriately denied plaintiff's claims under the policies.  To resolve this

issue, the Court must first determine the standard of review for the claims determinations.

### B.   Standard of Review Under ERISA

Unum argues the standard of review of its claim determinations is "arbitrary and

capricious."  (Unum's Brief at 27-28.)  Plaintiff does not appear to propose a standard of review.

Neither party discusses the circumstances under which a plan grants an administrator discretion,

yet a court should employ a heightened standard of review.  Thus, before turning to the record,

the Court must determine the appropriate lens through which it will view Unum's determination.

A court will view a plan administrator's denial of benefits under a de novo standard,

unless the plan gives the administrator fiduciary discretionary authority to construe its terms.

Firestone & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1988); 29 U.S.C. § 1132(a)(1)(b).  When a

plan grants discretion to the plan administrator, the determination will generally be disturbed only if it is arbitrary and capricious, or constitutes an abuse of discretion.  Firestone, 489 U.S. at 115; see also Moats v. United Mine Workers of Am., 981 F.2d 685 (3d Cir. 1992).  The Group Policy expressly grants Unum discretion to administer claims.  While the terms of the Supplemental Policy do not specifically grant Unum authority to determine benefits or construe its terms, Unum argues it impliedly grants discretion because it allows the company to have claimants examined as often as reasonably necessary (UACL 00026) or to have a claimant's tax returns and financial records reviewed as reasonably required (UACL 00032).  Unum argues that "without discretion to evaluate the evidence, there would be no need for such provisions."  (Id.) Plaintiff does not contest these arguments and the Court is satisfied that the Supplemental Policy adequately delegates claims administration responsibilities to an administrator, such as Unum, sufficient to trigger the arbitrary and capricious standard of review.  See Luby v. Teamsters Health & Welfare & Pension Trust Funds, 944 F.2d 1176, 1180-81 (3d Cir. 1991) (recognizing that discretion may be implied).

A decision is "arbitrary and capricious" if it is not rational or based on consideration of the relevant factors.  Moats, 981 F.2d at 687.  To warrant reversal under the arbitrary and capricious standard, the administrative decision must be "without reason, unsupported by substantial evidence or erroneous as a matter of law."  Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (quotations omitted).  Under this standard, therefore, the Court could reverse the claims administration decisions only if it found them to be without reason, unsupported by substantial evidence, or erroneous as a matter of law.

A court will apply greater scrutiny to a claims administration decision, however, where a

conflict of interest exists.  "[T]here is a structural or inherent conflict of interest" where the

insurer of an ERISA plan also acts as a claims administrator.  <u>Lasser v. Reliance Standard Life</u>

<u>Ins. Co.</u>, 344 F.3d 381, 385 (3d Cir. 2003) (citing <u>Pinto v. Reliance Standard Life Ins., Co.</u>, 214

F.3d 377, 387 (3d Cir. 2000)).  That is, to the extent the funder of a plan has discretion to avoid

paying claims, it promotes the potential for its own profits and, "[e]ven the most careful and

sensitive fiduciary in those circumstances may unconsciously favor its profit interest over the

interests of the plan, leaving beneficiaries less protected than when the trustee acts without self-

interest and solely for the benefit of the plan."  <u>Pinto</u>, 214 F.3d at 384 (quoting <u>Doe v. Group</u>

<u>Hopitalization & Med. Servs.</u>, 3 F.3d 80, 86-87 (4th Cir. 1993)).  Recognizing these dangers, the

Court of Appeals for the Third Circuit has held that "when an insurance company both funds and

administers benefits it is generally acting under a conflict that warrants a heightened form of the

arbitrary and capricious standard of review."  <u>Pinto</u>, 214 F.3d at 378.  Notably, courts have

treated the interests of a subsidiary of a plan insurer that administers claims the same as the

funder of an ERISA plan, and have applied the heightened level of scrutiny notwithstanding the

delegation of claim determinations to that subsidiary.  <u>See</u>, <u>e.g.</u>, <u>Vega v. Nat'l Life Ins. Serv. Inc.</u>,

188 F.3d 287, 295 n.7 & 300 (5th Cir. 1999) (en banc).

   A structural conflict of interest is present in Unum's determinations under the Group

Policy because it both funded the policy and administered benefits applications by its

participants.  A structural conflict is also present in the determinations under the Supplemental

Policy.  The apparent common interest in profitability between Unum Provident Corporation,

which administered the Supplemental Policy, and Provident Life, which funded the Supplemental

Policy, gives rise to such a conflict.  Moreover, each medical professional that Unum used to

evaluate whether or not the plaintiff qualified for benefits was an Unum employee.  Accordingly, the Court must apply a higher level of scrutiny to Unum's claims determinations than the "arbitrary and capricious" standard proposed by the defendants.

The degree of scrutiny applied to conflicted plans depends on the extent of the conflict. The Pinto court held that the level of review of an administrator's decision will be determined by applying a "sliding scale method, intensifying the degree of scrutiny to match the degree of the conflict." 214 F.3d at 379.  In applying this "sliding scale," courts will consider the "sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and the company." Id. at 392.  The Pinto Court, for example, considered that the insurance company reversed a participant's benefits award because Social Security denied her claim, but failed to reinstate it when the Social Security denial was reversed, id. at 393; the appearance of "selectivity that appears to be self-serving," id. at 393-94; and the rejection of an internal recommendation to reestablish the beneficiary pending further testing, id. at 394.  In view of these "procedural anomalies," the Pinto court viewed the company's decision with "a high degree of skepticism." Id.

With these standards in mind, the Court turns to the record of Unum's procedural and substantive decision in denying plaintiff's benefits claims.

## C.    The Claims Determinations

Defendants argue that summary judgment is appropriate because Unum's claims determinations, which they argue must be reviewed under an arbitrary and capricious standard, were supported by evidence (Unum's Brief at 27-30); there is no basis to find Unum's determinations arbitrary and capricious (id. at 31-33); plaintiff does not meet the definition of

22

"disability" under the policies because she did not receive regular care (id. at 33-38); and Dr. Ferraro's opinion is based on inadequate clinical data (id. at 38-39).

In response, plaintiff recounts her medical history and argues she is entitled to benefits. Plaintiff argues that summary judgment should be denied because (1) Unum produced no medical evidence to rebut her doctors' and Social Security's conclusions that she is disabled (Pl.'s Opp. Br. at 11); (2) Unum never personally examined the plaintiff (id.); and defendants provide no basis to refute the medical determinations of Dr. Ferraro and Dr. Papka, both of whom personally examined the plaintiff (id. at 11-12). Plaintiff further argues she was receiving regular and appropriate care, as required under the policies, because treatments were as frequent as medically necessary. (Id. at 12.) For these reasons, plaintiff argues Unum's determination was incorrect.

In their reply, defendants argue (1) plaintiff's opposition relies on SSA documentation that was not in the administrative record and, therefore, should not be considered (Reply at 3-7, 13-15); (2) Unum's argument for the arbitrary and capricious standard is undisputed (id. at 7-8); (3) Unum had ample basis for its determinations (id. at 11); and an independent medical examination was not required (id. at 11-13).

At the outset, the Court notes its agreement with the defendants regarding the SSA information.[12] First, given the differences between the standards employed in an ERISA benefits determination and an SSA determination, and the different underlying policies, the Court finds plaintiff's SSA determination of little value in determining whether or not Unum was correct in

_____

[12]Plaintiff submitted a letter dated May 23, 2005 from the SSA in furtherance of her position in this motion. [Docket Entry No. 16.]

23

its assessment of her claims.  See Pokol v. E.I. du Pont de Nemours and Co., Inc., 963 F. Supp.

1361, 1379-1380 (D.N.J. 1997) (analyzing the differences between the standards of disability

used by the SSA and the plan at issue in that case).  Second, the Court may not consider evidence

that was not before the administrator at the time of the decisions in issue.  Mitchell, 113 F.3d at

440.  Accordingly, the Court does not weigh the SSA determination or the May 23, 2005 letter

against Unum in its analysis.  Having dealt with the SSA information, the Court turns now to the

balance of the record.

### i.      Cognitive Deficits Caused by the Surgeries

The record could not credibly support a finding that plaintiff's surgeries caused her

allegedly disabling cognitive deficits.  The only evidence of a connection between plaintiff's

surgeries and her alleged cognitive impairment is her medical records from Dr. Ferraro.

Specifically, Dr. Ferraro's notes from her March 31, 2003 visit state that plaintiff was

"presenting to this office for follow-up because of difficulties at work, especially with retention .

. ." and was having difficulty performing job functions, "probably secondary to surgeries as noted

in her past medical history."  (UACL 00437.)  Dr. Ferraro also completed a physician's

statement, which was submitted with plaintiff's initial application, that diagnosed plaintiff with

"Stress, HTN [hypertension], S/P [status post] brain aneurysm and S/P carotid endarterectomy."

His statement further listed plaintiff's restrictions as "Avoid Stress – Complex Decision

Making."  (UACL 00005.)  Although Dr. Ferraro was plaintiff's treating physician, the Court

notes that Unum was not obligated to grant his opinions greater weight than its own experts'

evaluations.  See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831-33 (2003).

On the other side of the scale are opinions by Unum employees based on their review of

plaintiff's medical records.  For example, Dr. Neuren opined that the test that Dr. Ferraro employed was inadequate.  While Dr. Neuren did not address Dr. Ferraro's opinion that plaintiff had difficulty with "calculations," he stated that "recall can be affected by non-physical variable such as anxiety or depression" and "[c]onsequently, these results are not adequate for a determination of cognitive impairment."  (UACL 00105-00106.)  Moreover, Dr. DiDonna concluded that "[t]he fact that the claimant has had a carotid endarterectomy and a basilar artery aneurysm clipping with an uncomplicated course should not, based on a reasonable degree of medical certainty lead to memory or cognitive deficits."  (UACL 00117.)  Dr. Papka's report is the most persuasive evidence against the connection between the surgeries and the plaintiff's alleged cognitive defects.  Dr. Papka, the plaintiff's own neuropsychologist and psychotherapist, opined that a causal connection between plaintiff's alleged cognitive impairment and her surgeries "is lacking in the literature."  (UACL 00204.)  This record evidence, therefore, could not support a finding that plaintiff's surgeries caused her alleged cognitive deficits.

### ii.    Cognitive Deficits Caused by Anxiety and/or Depression

While defendants focus their attention on the absence of a neurological cause of plaintiff's alleged cognitive deficits, their analysis is much weaker in evaluating a possible psychiatric source of plaintiff's problems.  Indeed, the Court questions whether or not there is any record evidence that disputes plaintiff's inability to perform her job function because of her psychiatric condition.  Thus, the Court finds, at the very least, an issue of fact as to whether or not Unum abused its discretion in denying her benefits claims.

The key evidence in favor of cognitive impairment consists of continued medical documentation by Dr. Ferraro and the Papka Report.  Specifically, the Court notes Dr. Ferraro's

"mini-mental examination," which he performed on March 31, 2003 and the mention of cognitive issues, such as memory loss, in various subsequent treatments.  Further, Dr. Papka performed a more comprehensive examination that, while conducted on January 6 and 27, 2004, was consistent with Dr. Ferraro's assessments and harkens back to medical history, which suggests cognitive impairment at the time of plaintiff's March 31, 2003 visit with Dr. Ferraro. The defendants' doctors challenge the sufficiency of the tests and reliability of their results. These challenges, however, overwhelmingly go to the cause rather than the existence of the plaintiff's alleged cognitive deficits.

In its April 26, 2004 letter denying plaintiff's claims.  Unum concluded that plaintiff's "stresses" likely derive from her relationship with her manager and their review does not support an adequate level of incapacity to perform the material and substantial duties of her job as it exists in the national economy.  (Affidavit of Charles Z. Schalk, Esq., Ex. O.)  Unum argues this precludes her from recovery under the "Regular Occupation" provision of the Group policy. Under this argument, Unum denied benefits because it claimed there was insufficient evidence that plaintiff was unable to perform the "material and substantial duties of her occupation as it exists in the national economy" versus her job at her individual place of employment.  The Court is unable, however, to find substantial support in the record for this position.  The Regular Occupation clause defines the job that plaintiff must be unable to perform, not the cause of her disabling condition.  The fact that plaintiff's symptoms may have been caused, in part, by circumstances at her specific job site does not preclude a finding of her inability to perform her job as it is performed in the national economy.  In short, Unum's conclusory assertion that plaintiff's stresses are likely caused by her boss cannot defeat her application for benefits.

Nothing in the record weighs against the plaintiff's medical evidence of disability, albeit from depression and anxiety rather than her surgeries.

The Court further notes that Unum's experts did not examine the plaintiff. The Court is mindful that Unum's failure to conduct an independent medical examination is not itself sufficient grounds to reverse a determination. See, e.g., Work v. Hartford Life and Accident Ins. Co., No. CIV.A.04-2565, 2005 WL 3071704, at *17 (E.D. Pa. Nov. 15, 2005). Indeed, a plan administrator does not have an affirmative duty to engage in further investigation of a claim or to gather information beyond that which is supplied. Pinto, 214 F.3d at 394 n.8. Rather it is but one factor the Court considers in analyzing the procedural aspect of Unum's determinations. This consideration finds support in the Pinto court's observation that "neither of the doctors retained by [the insurer] had the same contact with Pinto as [her treating physician] did." Id. at 394.

### iii.   Regular and Appropriate Treatment

Likewise, the Court finds that defendants' conclusion that plaintiff did not receive regular and appropriate medical treatment under the policies to be somewhat flawed. The Group Policy requires that a participant demonstrate "regular care" by a physician. (UACL 00484.) "Regular care" means the participant (1) "personally visit[ed] a physician as frequently as medically required" to effectively manage and treat the disabling condition and (2) receive the most appropriate treatment and care, which conforms with generally accepted medical standards for the disabling condition by a physician who is the most appropriate to handle such condition. (UACL 00484.)

The record shows evidence of cognitive impairment in Dr. Ferraro's notes from plaintiff's

March 14, 2003 visit, where he noted plaintiff's "anxiety 2nd job."  (UACL 00234.)  Her

cognitive difficulties were documented again in connection with plaintiff's March 31, 2003

follow-up, where Dr. Ferraro noted that she was "presenting to this office for follow-up because

of difficulties at work, especially with retention" and was having difficulty performing job

functions.  (UACL 00437.)  During that visit, Dr. Ferarro performed a mini-mental exam, which

showed deficits in the "Attention and Calculation" and "Recall" categories.  (UACL 00423.)

Based on this, Dr. Ferraro concluded plaintiff "is disabled from present work" and "will

commence disability on 4/14/03 and be on permanent/long term disability"  and recommended

that she see a neurologist.  (UACL 00241.)  The record further reflects treatments by Dr. Ferraro

on June 3, 2003 (UACL 00255), July 3, 2003 (UACL 00254), August 21, 2003 (UACL 00253),

all of which note "memory loss" in the Assessment section of the form.  Notes from the July 3,

2003 and August 21, 2003 visits also reference plaintiff's treatment with the memory loss drug,

Aricept.  (UACL 00253-00254.)  Dr. Neuren knew plaintiff had been treating with Aricept but

dismissed this by stating "is no reference to her taking this agent on the most recent visits of

1/02/03."  (UACL 00222.)

Dr. Papka then saw the plaintiff on January 26 and 27, 2004.  The Papka Report recites

the plaintiff's encounter with her supervisor where she was told she was not the girl she used to

be and references cognitive impairment issues from that time forward.  (UACL 00207.)  The

Papka Report further notes severe impairment in plaintiff's psychomotor speed using the

dominant hand, written arithmetic, and simple tracking; moderate impairment in plaintiff's

verbal recognition and timed three-dimensional visuospatial construction; and mild impairment

with respect to her rote attention, working memory, figural memory, written language,

confrontational naming, visuospatial construction, mental flexibility and speed, and verbal fluency to letters.  (UACL 00204.)  Dr. Papka concluded that the most likely cause of this impairment is anxiety and depression.  (UALC 00204.)  The report notes that her increased level of anxiety over these cognitive issues was "gradually getting worse."  (UALC 00207.)  The record further shows that plaintiff commenced taking the depression drug Wellbutrin during the week of March 10, 2004 and continued her sleep study sessions, which completed on March 16, 2004.  (UACL 00194.)

Unum's experts' contend this history reflects inadequate treatment for cognitive defects under the policies.  While Unum criticized the extent of Dr. Papka's examination and argue she used outdated tests, it concedes that the results could be attributed to psychological factors. (UACL 00143 stating "the pattern of test results was . . . indicative of psychological or motivational factors.")  Indeed, Dr. Papka's report is the first indication in the record that the etiology of plaintiff's symptoms was psychiatric rather than neurological.  Within weeks of Dr. Papka's diagnosis, plaintiff began taking medication of the diagnosed condition – anxiety and depression.  Certainly defendants could not expect plaintiff to have commenced treatment for her psychiatric conditions until they were diagnosed.  Yet, in the end, that is their argument.  Thus, defendants' decisions to deny benefits based upon the failure to seek appropriate treatment were dubious, at best.

Notably, the Court finds the five-week delay between Dr. Papka's recommendations and plaintiff's treatment with Wellbutrin to be of minimal import to her claims applications.  While defendants argue this is not "regular treatment" under the policies, the record contains no evidence that this minor delay interrupted treatment necessary to effectively treat plaintiff's

29

disabling condition.  Nor does the Court find it to be probative of her ability to function at work.

For these reasons, defendants' motion for summary judgment with respect to plaintiff's claims for benefits for her alleged disability due to anxiety and depression is denied.  The Court invites plaintiff to make a motion on this issue so it may determine whether or not there is any issue of material fact as to plaintiff's entitlement to such benefits.

## IV.      CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment is granted as to plaintiff's claims for disability based upon neurological deficits resulting from her prior surgeries and denied with respect to her claim of disability based on cognitive impairment related to anxiety and depression.

February 3, 2006

                                            /s/Stanley R. Chesler
_____     United States District Judge